JOHN E. WALLER, Appellant, v. THE STATE OF NEW YORK, Respondent.

SKANEATELES PAPER COMPANY, Appellant, v. THE STATE OF NEW YORK, Respondent.

Mere words of appropriation of lands for state purposes, unaccompanied by any act on the part of the officers of the state towards carrying such appropriation into execution, *i. e.*, taking possession of or controlling in some form the property which is to be appropriated, do not amount to an actual and complete appropriation.

Upon the hearing before the Board of Claims upon claims presented by the owners of mills upon the creek forming the outlet to Skaneateles lake, for damages alleged to have been caused by reason of the interference of the state with their water rights, these facts appeared: In 1843 the canal board adopted the following resolution : "That the waters of the Skaneateles lake and the outlet to the same be and they are hereby appropriated to the use of the public for a reservoir and feeder to the Erie canal." The resolution was prefaced by a recital referring to a report, plan and map made by the state engineer. The report stated in substance that by private enterprise the lake had been made a reservoir by means of a dam across the outlet, thus furnishing hydraulic power to mills below. The report, plan and map showed that the lands and hydraulic power proposed to be taken were "immediately at the outlet and just below the dam," and that the plan could be carried out " without injuring the hydraulic power on the stream below." Immediately upon the passage of the resolution the state took possession of the lands included in the map and plan, and the lake has since been used as a feeder to the canal, all of its waters, however, flowing down the natural channel of the creek forming the outlet, and the flow of water in the stream below the lands so taken possession of was not affected materially save on a few occasions, when the flow was temporarily interrupted. In pursuance of statutes authorizing the hearing of claims for damages thus occasioned to the owners or operators of mills using the water power below, such claims were presented, and awards made, which were paid by the state. Among these claimants were the predecessors in title of the claimants here. In 1892 the state officials closed the gates in the dam and stopped the flow of water in the creek for a time, to the damage of the claimants. *Held*, that the rights of the owners on the stream below were not included in the words of appropriation in the resolution of the canal board, and so they had no grounds upon which to base an appearance and claim any permanent damage to

their rights; and that the state was liable for the damages shown to have been sustained.

*Sweet* v. *City of Syracuse* (129 N. Y. 316), distinguished.

(Argued January 16, 1895; decided February 5, 1895.)

APPEALS from awards of the Board of Claims, made April 13, 1894, which dismissed the claims and awarded the claimants above named nothing for damages alleged to have been sustained by them as riparian proprietors on the canal forming the outlet to Skaneateles lake by the stoppage by the state of the flow of water from the lake through the outlet, from February 1 to April 30, 1892.

Prior to 1843 the state had been accustomed as occasion required to use the water in the Skaneateles lake for the purpose of a feeder to the Jordan level of the Erie canal. At that time there existed a dam at the northern end of the lake and just at the outlet through which its waters ran to the Seneca river, a distance of about nine miles. Along this creek or outlet there were various mill owners, and from the place where the waters issued from the lake into the creek down to the Seneca river there was a fall of about four hundred and fifty feet, thus making a valuable water right along the line of the creek. The owners of the land and of the water privilege at the outlet of the lake were the grantees of an individual named Gibbs, who in 1816 and 1817 was the owner and in possession of the land and of the dam across the outlet, and in one of the above-named years he had obtained the consent in writing, for a valuable consideration, of a large number of the owners of land on the shores of the lake, giving him the right and privilege to build and maintain a new dam at the outlet of the lake and across the same and to raise and keep up the water in the lake to the height of the water therein as it then was, which was about six feet above its natural height at the outlet. The instruments conveying these rights were recorded as conveyances of real estate, and in 1843 the title and rights of Gibbs had become vested in three individuals named David Hall, George F. Leitch and

Warren Hecox.   Pursuant to this license or privilege Gibbs or his grantees, prior to 1835, had constructed a stone dam at the outlet of the lake and across the same to a height suffi- cient to raise the water in the lake six feet above its natural height, and that dam remained of the same height as thus constructed until 1868, when it was re-built by the state as mentioned hereafter.   Gibbs or his grantees, prior to 1842, had erected on the lands owned by him or them immediately below the dam, mills and factories, machine shops and a tan- nery, all operated by the water furnished by the dam, the water for the mills being taken by races or flumes directly from the lake and discharged into the outlet thereof after passing through the mills and then passing along down the creek to its junction with Seneca river.   The head of water for these mills immediately below this dam was only about seven feet, and hence it was quite a detriment to them to have the water in the lake drawn appreciably below the height at which it could be kept by the dam ; but, neverthe- less, in some instances prior to 1843 the agents of the state, using the strong arm, had gone upon the land where the dam was and opened the gates and drawn down the lake and used the waters for the purposes of supplying the level of the canal with a sufficient quantity of water.   This was done without right and subject, of course, to the claims of the individuals who were damaged by reason of this action of the authorities of the state.   The state recognized its liabilities for this action of its agents, and it had, prior to 1843, on several occasions passed statutes providing for a hearing of the claims of the owners of these lands and dam, and of the mill privileges immediately below the dam, and for paying to them such damages as they had sustained by reason of these acts of the state.   This action on the part of the state in taking the waters from the lake would not be detrimental to owners of lands further down the creek, because of the fact of the great fall in the water, they having, by reason of such fall, all the force that they required, and the water passed over their lands on its way to the canal to be used for canal purposes, and it was

only a damage to those who were so close to the dam that they required all the head which the keeping of the waters of the lake up to the height that was permitted gave them in order to profitably work their mills. This situation at the outlet of the lake was not such as commended itself to the state authorities. It was naturally thought better to control these waters by obtaining the title and interests of the owners at the dam than by allowing them to remain such owners and paying damages to them whenever the state used the waters for the purposes of the canal. So in 1842, at a meeting of the board of canal commissioners, held in February of that year, there was presented to that board a report of Mr. Childs, chief engineer in the employment of the state, dated Jan. 6, 1842, which contained a plan for the improvement of Skaneateles lake and outlet as a reservoir and feeder to the Erie canal. This plan provided for a cutting down of the bed of the outlet below the dam and for the making of an excavation in the lake and outlet above the dam. While this report was under consideration by the commissioners a proposition was presented to the board by one of the owners of the land and dam at the outlet of said lake, and who was also the owner of a factory about one mile lower down the stream, in which he proposed to release the state from all claims for damages upon certain conditions contained in the proposal, and it was then resolved by the board that the waters of Skaneateles lake and the outlet thereof should be and the same were thereby appropriated to the public use as a feeder to the Erie canal, and that the plan proposed in the report of the engineer for the improvement of the lake should be adopted and measures taken for the construction of such work as would be necessary to carry into effect the object of the resolution. But it was also resolved that the resolutions were not to go into effect and no work was to be commenced until this owner already mentioned should have executed and delivered a release to the state of all claims for damages, as was proposed by him. Such release was not given, and on the 27th of May, 1842, the above resolutions, adopting the plan described in the

engineer's report of January 6th, were rescinded and no sub-
sequent proceedings were taken under them.  Subsequently,
and on the 6th of September, 1842, the board of canal com-
missioners, after reciting that there was an insufficient supply
of water for the Erie canal between certain points, and that it
appeared from the report of the chief engineer in the employ-
ment of the state, bearing date January 6, 1842 (being the
same report already mentioned), that the remainder of the
required supply of water for that portion of the canal could
be obtained from Skaneateles lake and the outlet thereof with
more economy than from any other source, adopted resolutions
by which it was first resolved that "the waters of Skaneateles
lake and outlet be and the same are hereby appropriated for
public use for a reservoir and feeder to the Erie canal;" and,
second, "that the plan upon which it is proposed to construct
such feeder, together with the surveys and estimates of
expenses," should be submitted to the canal board for their
approbation pursuant to the provisions of the Revised Stat-
utes in that behalf.  A plan, surveys, estimates, etc., were
immediately submitted to the canal board for its approbation,
but the canal board, instead of approving the plan, made
further alterations and placed other conditions thereon, and
provided generally that, prior to the construction of the
work, the commissioners should make such arrangements
with owners of land and of the water power as should
secure the state from all claims for damages arising from
such appropriation.  Nothing further was done, however,
and neither the order nor directions of the canal commis-
sioners or canal board were executed or carried out, and
no proceeding or action was taken under either of those reso-
lutions for the reason, as is stated, that the releases as required
to be secured by them could not be obtained.  These proceed-
ings are given simply as a preliminary history of the case.
Finally, however, on the 29th day of June, 1843, it appears
that a meeting of the canal board was held, and that reso-
lutions set forth below were adopted by it.  The resolutions
were prefaced by a recital that the canal commissioners had

represented to the board that the supply of water to the Erie canal at this point (the Jordan level) had been found insufficient for the purposes of navigation, and that the deficiency of such supply might be obtained from Skaneateles lake at a less expense to the state than the same could be obtained elsewhere, and that the commissioners had " caused the necessary surveys and levels to be taken, and accurate plans, drafts and maps of the contemplated improvement, together with an estimate in minute detail of the probable expense to be incurred thereby, to be made and submitted to the canal board, which estimated expense does not exceed the sum of $30,000." The canal board then adopted the following resolutions : " 1st. That the waters of the Skaneateles lake and the outlet to the same be, and they are hereby appropriated to the use of the public for a reservoir and feeder to the Erie canal. 2d. That the canal commissioners be directed to make the improvements necessary to carry the above resolutions into effect." The plan, map and estimate of expenses which were referred to in the above resolution by the canal board were the plan and estimate contained in a second report of Orville W. Childs, made to the canal commissioners subsequently to the report of January 6, 1842, and the map was one which showed the land and water appropriated by the state and included within the blue lines at the outlet of Skaneateles lake, which map was put in evidence by the claimants, and with those exceptions no surveys, levels, drafts, maps, plans or estimates were submitted to the canal board. This second report of the engineer refers to the first report, dated January 6, 1842, and speaks of that first report as contemplating a plan which provided for the lowering of the bed of the outlet below the dam, and also for the making of an excavation into the lake above the dam. This was to be done without reducing the head and fall at the dam below what it had formerly been " or in any respect impairing the value of the hydraulic power immediately at the outlet." But by the second plan it was proposed to obtain the supply of water for the canal when enlarged as well as at the then present time from this source,

Skaneateles lake, "and without lowering the bed of the out-
let below the present dam." The report then continued as
follows : " By individual enterprise an artificial reservoir has
been made of Skaneateles lake ; the surface of the lake has
by means of a dam across the outlet been raised about five
feet above its former elevation ; by properly controlling this
discharge, this depth may be held in reserve, and, with a
slight excavation which will be required in the bed of the
outlet above the dam, it may be drawn for the purpose of
navigation, as circumstances may require, *without injuring
the hydraulic power on the stream below.* Although the
expense of appropriating the waters of the lake and outlet
upon this plan, may exceed that described in the before-men-
tioned report, yet it is believed that the supply required may
be obtained with more economy from this than from any other
source." The report then contains an estimate as to the cost
of this new plan, and estimates some $18,000 as damages to
the owners of the hydraulic power, evidently referring to the
hydraulic power " *immediately at the outlet and just below
the dam,*" because the report says the owners on the stream
below are not to be injured. By the plan contained in the
first report the alteration was to be so made *as not to impair
the value of the hydraulic power immediately at the outlet ;*
by the second report the value of this hydraulic power
immediately at the outlet would be impaired, but provision
was made for paying the damage, and at the same time the
execution of the plan would be carried out *without injuring
the hydraulic power on the* stream below. The plan, map
and estimate of expenses which were before the canal board,
and referred to as having been sent to that board by the canal
commissioners, were the plan, map and estimate of expenses
contained in this second report of the engineer, by carrying
out which the value of the hydraulic power immediately
*below the dam would* be impaired and the hydraulic power
on the *stream below would not be injured at all.*

And the map accompanying the report of the engineer and
transmitted with it to the canal board by the canal commis-

sioners and put in evidence on this trial showed exactly when taken with this report and plan what the state proposed to take, and what work it proposed to do in order to carry out the resolution of the canal board as to appropriating the waters of Skaneateles lake and the outlet for the purposes of a feeder for the Erie canal. That plan was to take this dam and the lands adjoining it and immediately below it, and all the mill privileges and rights of the owners, Hall, Leitch and Hecox, and to thus appropriate as against them all the waters of the lake and outlet.

The claimants in these two cases now before us had properties which were situated, the one a mile and a quarter, the other nearly three miles below this dam on the banks of this creek, and the map which was filed did not embrace any portion of their land, nor did it extend beyond the lands owned by the three owners above named. Immediately upon the passage of this resolution appropriating these waters the state took possession of the lands of the owners above named, including the dam, and placed gate tenders who acted under the orders of the agents of the state in the use of such gates and in the supplying of the waters through them. Soon after taking possession of this dam and property adjoining by the state, the three owners of the lands thus taken filed their claims with the canal appraisers to obtain payment for the appropriation of their property by the state, and there was awarded by the board to them in varying proportions, nearly $30,000, which included damages for water power taken, for land taken, for loss in respect to the factory building, for loss in respect to the machine shop and water wheels, and indeed for all their interests at that point. No claim for damage was made by any one else, and no payment was ever made by the state to the owners of water rights lower down this creek, and the state has never paid any one for its appropriation of the waters of Skaneateles lake other than these landowners above mentioned. From the time when the state took possession of this dam and control of the gates, while the gate tenders acted under the orders of the state and gave

or withheld waters as they were directed to do by the state's agents, yet for most of the time the water had been sufficient for all the purposes of the claimants in regard to their mills and machinery erected by them or their predecessors along the banks of this stream. It would seem that a mark had been made on behalf of the agents of the state, indicating that if the water were kept to that point there would be sufficient head for the mill immediately below the dam to run a certain number of stone, and when that was the case there was sufficient water flowing down the stream to supply the owners lower down with all that was requisite for their use. The state did not divert any of the waters of the lake through any other channel, but all of the water has flowed down the natural channel of the creek and along and across the respective premises of the claimants from the time when the state took possession of the dam, as above mentioned. The flow of water from the creek, with occasional short periods, since this appropriation, has been uninterrupted and continuous, both in what is termed the open and closed seasons of navigation on the canal and during all of the time that the agents of the state have been in charge of the gates at said dam, except in some half dozen different years when they have been held back for a short time. In 1866 the flow of the water was stopped by closing the gates from eighteen to twenty days; and in 1868 the flow of water was wholly cut off for about forty-nine days, for the purpose of re-building the dam at the outlet. In 1892 there was another stoppage. The flow, with the exceptions as above stated, has been quite uniform and substantially the same in quantity during the season of closed as during the season of open navigation on the canal, and the flow has been substantially such in quantity as was required for the operation of the mills on the creek below those immediately at the dam, including the mills of the respective claimants herein, and this quantity has been thus permitted to flow from the lake, except as already mentioned.

In 1868 the state re-built the dam but did not increase its height, but by virtue of lowering the bed under the dam and

up to the outlet of the lake about two and a half feet, it secured that increased amount of water. The legislature in 1868 passed an act (Chap. 330 of the Laws of that year), which authorized the canal appraisers to hear the claims of all persons owning or occupying any water power on this creek for damages sustained since January 1, 1866, by reason of obstructing or withholding the waters of the creek by the state or its officers, and the law provided that in case the act proved were such as would establish a legal liability in a civil action against an individual or corporation, then the board had power to award such damages to such claimants as should be just, and provision was made authorizing the payment of any award thus made. By virtue of that act, the predecessors in title and in the occupancy of the premises and water power of the claimant, the Skaneateles Paper Company, presented to the canal appraisers a claim for damages suffered by them for the suspension of the running of their mill for want of water power for certain days in April, 1866, and in January, February and March, 1868, and the claim was subsequently heard upon its merits by the canal appraisers and an award made September 30, 1869, of over $6,000 for the damage, which award was subsequently paid. A large number of other and like claims were made about this same time and under this same statute, including the claim of one who was the owner of the premises described in the claim of the claimant Waller herein, and those claims were tried and awards made pursuant to the statute, and those awards were subsequently paid, including the award to the predecessor of the claimant Waller. In 1872, by chapter 583 of the Laws of that year, the legislature appropriated a certain sum for the payment of damages to the mill owners of Skaneateles outlet for the temporary diversion or appropriation of the waters of the outlet, to be settled by the canal commissioners, but no claim was to exceed $600 in amount. Pursuant to that act claims were made on the part of the owners of mills on the creek for damages for the temporary appropriation or diversion of the waters of the lake by the state, and such claims were allowed and awards made

and paid, and many of them were those who were lessees, occupants or owners of the premises now owned by the claimant John E. Waller. From February 1, 1892, to March 5, 1892, the gates in this dam were one-half closed, and from March 5 to April 30, 1892, they were wholly closed and no water flowed down the creek. The closing of the gates and the withholding of the water was for the purpose of accumulating and storing water inside of the lake for supplying the canal during the following season of canal navigation, and this action was by the state authorities and to the damage of the two claimants in this case. It is to obtain payment of these damages that these claims have been filed. The amount of damage has been agreed upon in case the state is responsible for any amount whatever, the amount being $1,000 in the Waller, and $2,500 in the case of the Skaneateles Paper Company. By chap. 314 of the Laws of 1890, amending chap. 291 of the Laws of 1889, permission was given to the Syracuse water board, under certain conditions and restrictions, to conduct a certain amount of water not required for the Erie canal, from Skaneateles lake to the city of Syracuse, for the purpose of supplying that city and its inhabitants with water. That act provided, however, that before any water should be taken from the lake under the provisions of the act, the city of Syracuse should acquire or extinguish the water power rights upon the outlet of said lake, to be affected by the proposed storage of water, and the city was directed to protect and save harmless the state of New York from and against all claims and demands of riparian owners upon said lake for loss or damage occasioned by any act or structure authorized by the act. The Board of Claims, after a hearing on the whole case, has made an award of "nothing," and each of these claimants has appealed to this court.

*Edwin Nottingham* for appellant, the Skaneateles Paper Co. The resolutions of the canal board of June 29, 1843, did not affect the appropriation of any of the water of the lake or outlet, for the reason that the canal board had no power to

make an appropriation of land or water ; that power was then vested by statute solely in the canal commissioners, and the only authority or duty which the canal board had in the matter was to approve of the plan and expense of the same. (R. S. part 1, chap. 9, tit. 9, art. 2, §§ 16, 17, 18 ; id. art. 4, § 74 ; *Yaw* v. *State*, 127 N. Y. 192.) The adoption and filing of the plan and map, the voluntary presentation of claims for damages by the owners of the land, water power, etc., included within the blue lines on the map, and the award and payment to these owners of damages for such land, water powers, etc., together with the proof and record of the award as a deed, had the effect to transfer to the state the title to the land, dam and water powers included within the blue lines on the map and the description in the award, together with all rights and privileges as to the maintenance of the dam and keeping up the level of the water in the lake vested in said owners. (*S. M. Co.* v. *State*, 104 N. Y. 562.) If the resolution of the canal board of June 29, 1843, in form appropriating the waters of the lake and outlet, had been adopted by the canal commissioners, and there is given to them all the effect they could have as resolutions of the canal commissioners, still they would not effect an appropriation of any of the waters of the lake or outlet, for the reason that an appropriation could not be made by resolutions alone, and the effect of the resolutions, however general or comprehensive their language, is controlled and limited by the plan, map and estimate referred to in them. (R. S. part 1, chap. 9, tit. 9, § 17 ; *In re N. F. R. Co.*, 46 Hun, 94 ; *In re R. E. R. Co.*, 57 id. 57.) The state owns only such lands and waters as are shown on the maps required by statute to be made and filed for the express purpose of showing such ownership, and it can have only such rights to the control and use of waters not shown on such maps as follow from the ownership of the land over which they flow. (*Lawrence* v. *Whitney*, 115 N. Y. 410 ; *Scriver* v. *Smith*, 100 id. 479.) Private property cannot be taken for public use, whatever the degree of interest taken, without notice to the owner of the taking, and to permit private property to be

taken from the owner without notice to him of the taking
would be destructive of property rights, and a violation of the
constitutional inhibition against depriving a citizen of his prop-
erty without due process of law.   (Lewis on Em. Dom. § 365;
*Stuart* v. *Palmer*, 74 N. Y. 183; *Remsen* v. *Wheeler*, 105 id.
573; *People ex rel.* v. *Henion*, 64 Hun, 471; *Wilson*
v. *Lynn*, 119 Mass. 175; *Yaw* v. *State*, 127 N. Y. 190;
*Warren* v. *S. M. Co.*, 143 Mass. 9.)   If the appropriation
of 1843 was not limited to the lands, water powers, etc.,
of Hall, Leitch and Hecox, and to such rights connected
therewith as were vested in them, it was an absolute
appropriation of all the waters of the lake and outlet by the
state, and of all of claimant's grantors' rights, title and interest
in and to those waters and to the use thereof; in other words,
it was an appropriation of the whole of the water power and
right which was a part of or connected with the premises
described in claimant's claim, as any other appropriation than
the aforesaid would have been void for indefiniteness and for
uncertainty as to the extent of the appropriation.   (*Hayden* v.
*State*, 132 N. Y. 533; *People ex rel.* v. *Trustees, etc.*, 137 id.
88; *In re Water Comrs. Amsterdam*, 96 id. 361; *M. E. R.
Co.* v. *Dominick*, 55 Hun, 198; *In re N. Y. C. & H.
R. R. R. Co.*, 70 N. Y. 191; *In re N. Y. & B. R. Co.*, 62
Barb. 85; *Howe* v. *Inhabitants of Weymouth*, 148 Mass. 605;
*Warren* v. *S. W. Co.*, 143 id. 9; *M. R. Co.* v. *Smith*, 109
Ind. 489; *I. & V. R. Co.* v. *Newson*, 54 id. 121; *Shute* v.
*Decker*, 51 id. 244; *Mathias* v. *Carson*, 49 Mich. 465; *Null*
v. *Zierle*, 52 id. 540; *Bennett* v. *Drain Comrs.*, 56 id. 635;
*T. A. A. & N. M. R. Co.* v. *Munson*, 57 id. 43; *R. Co.* v.
*Circuit Judge*, 95 id. 318; *Hayford* v. *County Comrs.*, 78
Maine, 153; *McDonald* v. *Nelson*, 59 Ind. 54; *Scraper* v.
*Pipes*, Id. 163; *Proprietors* v. *Randolph*, 157 Mass. 345, 351,
352, 353; *Miller* v. *W. W. Co.*, 148 Penn. St. 429, 433, 440,
441.)   The appropriation by the state in 1843 was not of all
the waters of the lake and outlet, or of the right to store and con-
trol the flow of all the waters of the lake and outlet, as against
claimant and its grantors; and as no valid appropriation was

made of anything less than the whole, the only valid appropriation made, if any, as against claimant and its grantors, was of the lands and rights of Hall, Leitch and Hecox only. (*People ex rel.* v. *Canal Board,* 2 T. & C. 275; Laws of 1890, chap. 314.) There is no consistent view or construction of the appropriation of 1843, except that which limits it to the lands and rights of Hall, Leitch and Hecox. (5 Paige, 137; 9 id. 547; *Howe* v. *Weymouth,* 148 Mass. 605; *Clinton* v. *Meyers,* 46 N. Y. 511; *Simon* v. *Bear,* 29 Wis. 255; *Penn. R. Co.* v. *Miller,* 112 Penn. St. 34.) The argument of the opinion of the Board of Claims against the equity of this claim has little, if any, basis in probability or fact, and is mainly based on unfounded assumption. (Angell on Water Courses [6th ed.], 105; *Tourtillot* v. *Phelps,* 4 Gray, 370.) Nothing can be claimed for the award of nothing in 1884 on the 1881 claim on the theory that it is *res adjudicata* here. (*Platt* v. *N. Y. C. R. R. Co.,* 37 N. Y. 472; *Smith* v. *Elliott,* 9 Penn. St. 345; *Locke* v. *State,* 140 N. Y. 480; *People ex rel.* v. *Schuyler,* 69 id. 246.)

*Charles A. Hawley* and *George Barrow* for appellant Waller. A consideration of the history and proofs demonstrates that the state never acquired or intended to acquire at Skaneateles anything more than the rights of an upper riparian owner. (Laws of 1839, chap. 150; Laws of 1840, chap. 278; *Corkings* v. *State,* 99 N. Y. 499; *S. M. Co.* v. *State,* 104 id. 562.) The resolution adopted by the canal board in 1843 did not make an appropriation of the waters of Skaneateles lake or its outlet. (1 R. S. 220–230.) Sections 17 and 18 (1 R. S. 220) contained all the authority of the canal board and canal commissioners relating to permanent appropriations of lands, waters and streams. (*Ten Broeck* v. *Sherrill,* 71 N. Y. 277.) The alleged appropriation of 1843 is invalid and ineffectual as an appropriation of the water rights of the claimant or of any part thereof. (1 R. S. 217, 218, §§ 4–6.) The only procedure by which the state could accomplish an appropriation for the canal in 1843 was by taking actual possession of the property itself. (Laws

of 1884, chap. 336; *Smith* v. *City of Rochester*, 92 N. Y. 463.) As matter of fact and as matter of law the state never took permanent possession of the water rights of the riparian proprietors on the outlet of Skaneateles lake, and, therefore, never appropriated them. (*In re P. B. Co.*, 108 N. Y. 475; Lewis on Em. Dom. § 3; *Enfield T. B. Co.* v. *H. & N. R. R. Co.*, 17 Conn. 40; *Weir* v. *S. P. S. & T. F. R. R. Co.*, 18 Minn. 155.) The subsequent storages of water made by the state, beginning with 1866, were not made by virtue of any prior acquisition or appropriation, but under the provision of chapter 196 of the Laws of 1833. (Laws of 1833, chap. 196; Laws of 1868, chap. 330; *Heacock* v. *State*, 105 N. Y. 246.) If the canal board possessed the authority or power to make an appropriation of the waters of Skaneateles lake which should include the water rights of the claimant by the adoption of a resolution, the appropriation attempted to be made in such manner was void for uncertainty. (*Hayden* v. *State*, 132 N. Y. 533; *People ex rel.* v. *Village of Haverstraw*, 137 id. 88; *M. E. R. Co.* v. *Dominick*, 55 Hun, 199; Mills on Em. Dom. §§ 115, 277.) The state has in many ways recognized the subsisting rights of the riparian owners upon the outlet. (Laws of 1868, chap. 330; Laws of 1872, chap. 583; Laws of 1890, chap. 314.)

*T. E. Hancock, Attorney-General,* for respondent. The appropriation by the state in 1843 of the Skaneateles waters cut off the rights of riparian owners along the outlet. *Swinnerton* v. *C. Ins. Co.*, 37 N. Y. 174; *People* v. *Snyder*, 41 id. 397; *People* v. *Breese*, 7 Cow. 429; *Chapman* v. *Wilber*, 6 Hill, 475; *Brown* v. *Schofield*, 8 Barb. 239; *People* v. *Canal Appraisers*, 33 N. Y. 464; *Niederhauser* v. *State*, 28 Ind. 258, 267; *Hatch* v. *C. & I. R. R. Co.*, 18 Ohio St. 93, 125; *Agawam Bank* v. *Strever*, 18 N. Y. 502; *Slater* v. *Jewett*, 85 id. 68; *Mayor, etc.,* v. *Sands*, 105 id. 217; *Jackson* v. *Lewis*, 17 Johns. 477; *Waller* v. *Harris*, 20 Wend. 562; *McClursky* v. *Cromwell*, 11 N. Y. 601; *Johnson* v. *H. R. R. R. Co.*, 49 id. 462; *Springstern* v. *Samson*, 32 id.

706; *Benton* v. *Wickwire*, 54 id. 226; *In re Middletown*, 82 id. 199; *In re O'Neil*, 91 id. 520; *Mangam* v. *City of Brooklyn*, 98 id. 591; *Humphreys* v. *N. Y., etc., R. Co.*, 121 id. 435; *Rexford* v. *Knight*, 11 id. 398; *Mark* v. *State*, 97 id. 572; *Heacock* v. *State*, 105 id. 248; *Stewart* v. *State*, Id. 255; *Benedict* v. *State*, 120 id. 228; *People ex rel.* v. *Tompkins*, 40 Hun, 230; *Baker* v. *Johnson*, 2 Hill, 347; *Turrell* v. *Norman*, 19 Barb. 236; *Birdsall* v. *Cary*, 66 How. Pr. 361; *People ex rel.* v. *Hayden*, 6 Hill, 360; *Blair* v. *Kiger*, 111 Ind. 193; *Farrington* v. *Payne*, 15 Johns. 432; *Porter* v. *Cobb*, 22 Hun, 278; *Secor* v. *Sturgis*, 16 N. Y. 554; Lewis on Em. Dom. § 664; *Smith* v. *People*, 47 N. Y. 337; *Jermaine* v. *Waggener*, 1 Hill, 279; 7 id. 357; *Hutchinson* v. *Comrs.*, 25 Wend. 692; *People* v. *Canal Board*, 2 T. & C. 242; *People* v. *Contracting Board*, 27 N. Y. 381; *Howland* v. *Eldridge*, 43 id. 461; *Guest* v. *City of Brooklyn*, 69 id. 511; *People ex rel.* v. *Leonard*, 74 id. 445; *People ex rel.* v. *Common Council*, 78 id. 33; *Osterhoudt* v. *Rigney*, 98 id. 234; *State* v. *Board of Public Works*, 42 Ohio St. 607; *I. Mills* v. *County Comrs.*, 106 Mass. 363; *David* v. *New Bedford*, 133 id. 549; *Smith* v. *Concord*, 143 id. 253; *Howe* v. *Weymouth*, 148 id. 605.) The legislation and judicial decisions relating to the Skaneateles waters justify the action of the Board of Claims. (*Sweet* v. *City of Syracuse*, 128 N. Y. 316; *Ferrens* v. *O'Brien*, L. R. [11 Q. B. Div.] 21; *Heyneman* v. *Blake*, 19 Cal. 579; *P. C. Co.* v. *Hoyt*, 57 id. 44.)

PECKHAM, J. I think that the Board of Claims has erred in its award in this case. The facts set forth in the above statement seem to me to show beyond controversy that the state never intended to, and, in fact, never has appropriated and taken possession as owner of all the waters of Skaneateles lake, as against all the riparian owners, below the dam down to Seneca river. The state, prior to 1843, had been frequently guilty of acts of trespass as against the owners of the dam and the lands immediately surrounding it and the mills immediately

below it.　The state's agents had, upon occasion, gone upon the lands of these private individuals and without right opened the gates of the dam and taken the waters from the lake in larger quantities than the proper use thereof by the owners themselves would have required for the running of their mills and their machinery dependent upon that water power, and by taking this excess of water they reduced the head and thus impaired the power and prevented the owners from exercising the rights which they had at the dam and in the use of the waters above it.　Although the state was thus a wrongdoer, and though by reason of the wrong it had injured the owners of the water rights immediately below the dam, yet it had thereby done no injury whatever to the lower riparian owners. The water flowed through its natural channel across the lands of these owners, and the natural fall between the dam and themselves was sufficient, and hence they had all the use of the water power which they required.　It was not in the letting of the water down that any injury could come to the owners below.　The retention of the water, if carried far enough to prevent the use of the machinery by the lower mill owners, would alone cause them injury.　But nothing of that kind had happened up to 1843, and it is evident that the final action of the state was without reference to them.　The first report made by the engineer to the canal commissioners, in 1842, January 6th, gave a plan by which more water could be obtained from the lake without injury to the mill owners immediately below the dam.　The method by which that work was to be done is not important to now notice, but it is material to note that the plan provided for no damage being done to any owner of hydraulic rights on this stream.　To speak of the method by which this end was to be accomplished is not necessary.　That report and plan were never carried out ; no work was ever done under it, and the plan was abandoned. Another report was made by the engineer containing a plan which was to be more expensive in carrying out than the plan contained in the first report, because while the owners of hydraulic power further down on the stream below were not to

be injured, yet the owners of such rights immediately below the dam would be damaged, and the value of their rights greatly diminished. This second plan provided, therefore, that these owners were to be compensated for the loss of their rights, and for the lands which they owned, and for the dam itself, all of which were to be appropriated and taken possession of and owned by the state, and payment was to be made therefor to such owners. As the canal had been completed for quite a number of years at this time, neither the canal commissioners nor the canal board had the right to take any property or appropriate any lands which they might have had under provisions looking to the construction of the canal; and the powers of the canal commissioners and of the canal board have their origin, so far as their right to take these lands and these waters are concerned, in sections 17 and 18 of the 1st Revised. Statutes (p. 221), and section 74 (id. p. 230).

I have found in the record here no actual decision of the canal commissioners, pursuant to section 17 of the above statute, that, in their opinion, it was necessary or expedient to open a new feeder for the canal at this point, nor is there anything showing that they had caused to be made the necessary surveys and levels, and accurate drafts, plans and models or maps of the contemplated work necessary in opening such new feeder, or showing that any estimate in minute detail of the probable expense to be incurred, had been made, except such proof as may be inferred from the recitals which precede the the resolution adopted by the canal board in June, 1843. We may assume, however, that the canal commissioners had done all that was requisite in order to comply with section 17 above cited, and that the canal board had the necessary plan, map, levels, etc., before it at the time when it passed that resolution. There is no pretense that any other plan or map was adopted by the canal commissioners, or was before the canal board, than the plan which is spoken of in the second report of the engineer to the canal commissioners, and that report provides for the execution of the work and the taking of the land necessary therefor upon

the plan of dispensing with lowering the bed of the outlet below the dam at the village and also for the payment of damages for the water rights to be appropriated belonging to the individuals whose mills are situated immediately below the dam which was to be taken. This plan worked no injury to the owners lower down. The map which accompanied this report showed the land which was to be taken and the dam and the situation of the mills, the owners of which were to be compensated for the property of which they were to be deprived and for their water rights. With this plan and this map before the board and with this recital which precedes the resolution adopted by it, it is plain that when the canal board made use of the words of appropriation regarding the waters of the lake and the outlet, it had reference to the subject-matter which was then before that board as contained in that report, plan and map. The general use, therefore, of the words of appropriation, where the resolution speaks of appropriating all the waters of the lake and of the outlet, must be held under such circumstances to refer to the appropriation of all such waters as against those owners whose lands and property and water rights were by the plan to be taken and appropriated and who were specially designated and known and described in the report, the plan and the map before the board when the resolution was adopted. If there were any doubt in regard to the meaning of such language it seems to me that the acts of the officers of the state at the time and immediately subsequent to the passing of that resolution, even down to the year 1892, have been consistent with no other idea than that this appropriation was directed at and meant to apply to the owners of the rights and lands described in the report, the plan and the map. In this way it could very properly be said that as against them the waters of the lake and of the outlet were taken possession of and appropriated by the state, because the state immediately took the lands and extinguished the rights of those owners by virtue of such appropriation. But they never have asserted any right absolutely and subject to no claim or liability for dam-

age, to appropriate the waters of this lake and its outlet as against the lower riparian owners and the state has not assumed the right to wholly withhold the supply of water, without any corresponding obligation to pay to the owners the amount of the damage which such owners might sustain by reason of such withholding. The finding of the Board of Claims and the evidence to support it are both clear upon this question, and although the state has exercised its right to use the water in this lake for the purpose of a feeder to the canal, yet that right has never been inconsistent with the rights of the riparian owners below, excepting in the case of the storage of the water and the withholding of the supply, and in those cases where the withholding of the supply was to such an amount as to prevent the operation of the machinery of the mills by their owners on the stream below, the state has recognized that such withholding was unlawful, and it has passed statutes providing for the hearing of the claims of such owners, and upon proof of facts which would, as against individuals, constitute a legal claim, it has made provision for the ascertainment of the amount and the payment thereof by its agents. This was done in 1868, after the state had withheld the waters for purposes of its own for a length of time sufficient to cause an appreciable damage to the owners below, and thousands of dollars were paid to such owners by the state on account of such damage, which, if the theory of the counsel for the state as now presented were correct, the state was never under the slightest obligation, legal or moral, to pay because of the fact that it had taken possession of and appropriated to its own use those rights many years ago.

We do not think that by the action of the canal board or the canal commissioners, or their combined action, these rights of the owners upon the stream below were included in the words of appropriation in the resolution of the canal board. Therefore, neither they nor their predecessors had any ground upon which to base an appearance before the canal appraisers and attempt to prove any permanent damage to their rights by

virtue of the resolution of appropriation. The appropriation did not touch them or their rights. Mere words of appropriation, unaccompanied by any act on the part of the officers of the state towards carrying such appropriation into execution and taking possession of or controlling in some form the property which is to be appropriated, cannot amount to an actual and complete appropriation, and when we have, as we have in this case, ample scope for the application of these words of appropriation to those owners only who were included in the engineer's report and plan and map, and in respect to whom actual possession was taken, they will not be extended so as to include those who beyond all question were not within the contemplation of the board which, with the plan and map before it, passed the resolution.

This policy on the part of the state not to then take the rights of the riparian owners farther down the stream was not unwise at the time. For more than twenty years after the appropriation as stated, there was no trouble with these owners, and the state had all the water it required. And for more than twenty years in addition the occasions have been few for withholding the water to the damage of the owners. It would probably have been quite expensive to extinguish those rights at that time, and the necessity for doing so was not present. The state continued on, therefore, and when the necessity arose for temporarily withholding water it was done, its liability for the damage it thus caused was acknowledged, and it was paid under legislative sanction. It is conceded that the state has never in fact paid for the permanent appropriation of these rights, and we find no hardship in making it liable for causing them temporary damage since the last payment on that account.

There is nothing in the case of *Sweet* v. *City of Syracuse* (129 N. Y. 316) which is inconsistent with the views herein expressed. The question as to what rights existed in the lower owners of the waters below the dam on this stream was not in controversy. The plaintiff in that case assumed that the state was the owner of the waters of the lake and of the outlet,

and that by virtue of proceedings heretofore taken the state had made Skaneateles lake substantially a part of the canal system of the state, and that it had no constitutional power, therefore, to permit any portion of the waters of that lake to be used for any other than canal purposes. There were some other constitutional objections discussed in that case which are not material here. This court simply said that at most the state had taken the waters of the lake to an extent that was necessary for canal purposes, and that any surplus beyond that might be, by legislative act, permitted to be used for other purposes without in any degree infringing upon the constitutional provision that the canals of the state shall not be sold or in any manner disposed of. What was stated in regard to the rights of the state in the lake was simply with reference to this question, and without having the subject of the rights of the lower proprietors on the stream as between them and the state in mind, and without deciding or attempting to decide, or even referring to the question whether such rights did or did not exist. The act itself, however, which enabled the city of Syracuse to take the water upon conditions specified, recognizes that there might be important rights on the part of these lower owners on the stream, and indeed the act seems to assume that there were, and it provides that the city shall not go on with the construction of the work unless, under certain circumstances, those rights are extinguished, as provided for in the act.

I recognize the importance of the principles which might be deduced from the decision of this case in some of its possible aspects. We do not, however, intend to decide what generally it may be necessary and requisite for the state to do in order to obtain the right to the use of all the water in this or any other lake or stream, and as against the world for the purpose of carrying on its canal system. We limit our decision to the peculiar facts in this case, and we hold that the words contained in the resolution of the canal board appropriating the waters of Skaneateles lake and the outlet of the same to the use of the public as a reservoir and feeder to the

Erie canal are to be limited, by reason of the facts above detailed, to the property and rights spoken of in the report, plans and map of the engineer, which were before the canal board at the time of its adoption of the resolution, and which, when read in connection with the resolution, limit those words in the manner already indicated.

For these reasons we think the claimants made out a good cause of action against the state for damages sustained by them by the withholding of the waters from the Skaneateles creek in 1892, as described in their claims, and as all the facts have been brought out, and there is substantially no dispute in regard to them, and as they lead, as matter of law, to the conclusion that a cause of action was made out, it is proper to order judgment here for the amount of the damage that it was conceded the plaintiffs were entitled to, if they were entitled to any. The award of the Board of Claims should, therefore, be reversed and an award entered for $1,000 in favor of the claimant John E. Waller, and an award of $2,500 entered in favor of the claimant the Skaneateles Paper Company, with costs.

All concur, except ANDREWS, Ch. J., not voting, and O'BRIEN, J., dissenting.

Award reversed and ordered accordingly.