view of such intention and covenant, he cannot insist that, as he now became the owner of all the land upon both sides of the private road from the Lake road to the lands of the plaintiff, whatever easements the adjoining owners had against him in such private road were extinguished. Nor, for the reason already stated, can he insist that, because the plaintiff is not a party to the deed from James Hay to him, she takes nothing under the covenants in that deed. In consideration of the equity against James to protect plaintiff in the right of way, James, as the owner of the 2½ acres, being in a situation to protect her, procures, upon a valid consideration, a covenant from the defendant to do so. Such covenant runs to her, within the principle of the many cases of covenant under seal, following Lawrence v. Fox. 20 N. Y. 268. The rule as stated in Durnherr v. Rau, 135 N. Y. 222, 32 N. E. 50, is:

"It is not sufficient that the performance of the covenant may benefit a third person. It must have been entered into for his benefit, or at least such benefit must be the direct result of performance, and so within the contemplation of the parties, and, in addition, the grantor must have a legal interest that the covenant be performed in favor of the party claiming performance."

The plaintiff's land was the only land to be benefited by this covenant, and the grantor's legal interest in its performance was his obligation to the plaintiff to confirm the right of way to her land while he was in a position to do so. Moreover, the covenants not to build a fence within 12½ feet of the center of the private road, while not grants of the right of way over it, are evidence of its existence; not indeed to absolute strangers to the deed, but in favor of previous grantees of the grantor, if it is seen that their rights against the common grantor were intended to be confirmed thereby. Murphy v. Lee, 144 Mass. 371, 11 N. E. 550. It is obvious that the intention here was to confirm the plaintiff's right of way in question. The complaint does not state the terms of Percival Knauth's deed to the appellant. It alleges that he took title with full knowledge of all the facts. It is not contended that he stands in any better position than his grantor, Percival Knauth.

The interlocutory judgment should be affirmed, with costs, with leave to the appellant to answer within 20 days upon payment of costs here and below. All concur.

---

# NEW YORK CENT. & H. R. R. CO. v. STATE.

(Supreme Court, Appellate Division, Third Department. January 11, 1899.)

1. EMINENT DOMAIN—APPROPRIATION—WHAT CONSTITUTES.

　　At the time of a conveyance of land within the boundaries of a flow line of a proposed reservoir, run some 10 years before, nothing had been done by the state to interfere with the owner's possession, and no notice of appropriation had been served. Intermittent efforts towards building a dam had been going on, however, and considerable work had been done thereon; and a new survey had been made, and maps of the proposed reservoir approved and filed. *Held*, that there was no appropriation.

2. SAME—FILING OF MAP.

　　The filing of the map alone did not amount to an appropriation.

**3. SAME—APPROPRIATION BY LEGISLATURE.**

Laws 1891, c. 342, provided, "The superintendent of public works is hereby authorized to clear the flow ground that will be covered by water, upon the construction of a reservoir on the Black river above Forestport Pond," and provision was also made for letting the work, and an appropriation was made to meet the expense. *Held* not an appropriation by statute.

**4. SAME—COMPENSATION FOR IMPROVEMENTS.**

The owner may recover for loss of or damage to improvements made in good faith pending proceedings to appropriate land to public use.

**5. RAILROADS—CONSENT TO CONSTRUCTION—CANALS.**

Laws 1834, c. 276, incorporating the Medina & Darien Railroad Company, gave the canal commissioners power over so much of "any" railroad as should pass over "any" canal or feeder, or within 10 rods thereof, so far as might be necessary to preserve the free use of the canal and feeder; and provided that "said company" should obtain permission of the commissioners before constructing its road as above. *Held,* that said provision applied only to the company incorporated by the act.

Appeal from court of claims.

Claim filed by the New York Central & Hudson River Railroad Company against the state of New York. From a judgment dismissing the claim, plaintiff appeals. Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, and MERWIN, JJ.

Charles E. Snyder, for appellant.

T. E. Hancock, Atty. Gen., for the State.

MERWIN, J. In April, 1894, the appellant, as lessee of the Mohawk & Malone Railway Company, operated a railroad which crossed Black river some two or three miles southeasterly of the village of Forestport. At the crossing, the river was the boundary between the towns of Remsen and Forestport, in the county of Oneida. The valley of the river at this point in the town of Remsen was about 1,000 feet wide, and the railroad track was carried across upon an embankment from 35 to 48 feet in height. The embankment was finished in December, 1891, and thereafter it was used for railroad purposes. The land occupied by the embankment was a part of the farm of John S. Kent, from whom the predecessors of the appellant acquired title by contract dated June 4, 1891, and subsequent deed October 9, 1891. The work was commenced by consent of Kent a short time prior to the making of the contract. A map of the route and profile was filed in Oneida county clerk's office on December 7, 1891. In the construction of the Black River Canal and Erie Canal feeder, under chapter 157 of the Laws of 1836 and subsequent acts, a dam had been built across Black river, near Forestport, in or prior to 1848. This operated to produce the Forestport Pond, so called, from which the waters of Black river were conducted into the Erie Canal feeder. In 1884, at the head of the flow of the Forestport Pond, and in pursuance of chapter 452 of the Laws of 1883, a new dam was commenced, or work done in reference thereto, with a view of obtaining further storage of water for canal purposes. This dam was completed in the summer or fall of 1893, and, when fully in use, operated to set back the water to the depth of about 13 feet in the valley across which the

railroad embankment was built.    From December, 1893, to April, 1894, the water was kept continuously about the embankment, and on the 10th and 13th April, 1894, a portion of the embankment—about 400 feet along the central part—gave away.    This was caused, as the appellant claims, by the action of the water set back by the dam. On the 3d September, 1892, a map was filed in the office of the clerk of Oneida county purporting to show lands proposed to be flooded and appropriated to the use of the state for a Black river reservoir at the head of Forestport Pond, and on or about September 14, 1892, the superintendent of public works served a copy of said map, with a notice of such appropriation, upon the owners or occupants of the lands flooded; among others upon the said John S. Kent, and upon the predecessor of the appellant, then in the occupation of the said embankment.    The map included, with others, the lands occupied by the railroad.    The new dam was 15 feet high, and was located about a mile below the railroad.    On the 21st August, 1894, the appellant, in its own behalf and as assignee of its predecessors in interest from the time of the contract and conveyance from Kent, filed the claim in suit for the recovery of the damages occasioned by the injury to the embankment above referred to, and by the appropriation by the state of the land for its reservoir.

Upon the part of the state it is claimed that the state had in fact appropriated the land in question for the purpose of its reservoir before the appellant or its predecessor in interest acquired title from Kent.    The project of the construction of a reservoir at the head of the Forestport Pond had been a matter of public interest for several years. By chapter 475 of the Laws of 1881 (page 643) provision was made for "survey of flow and line on Black river above Forest port Pond," the work to be done under the direction of the state engineer and surveyor. Thereupon, in the fall of 1881, Mr. Phelps, an engineer and surveyor in the employ of the state, ran the flow line of a supposed dam that would be 21 feet above the old dam at Forestport, and would be located at or near the place where the dam was afterwards located. He followed the contour of the ground on the same level, embracing all the ground that would be flowed, setting up stakes about two chains apart, and marking the line of trees.    It was then timber land most of the way.    The stakes were marked with the course and distance and the number of the station.    They did not indicate what they were there for except that a survey had been made.    From the notes made by the surveyor a map was made, called "Map of Proposed Reservoir," and filed in the engineer's office.    The flowed ground, as indicated on this map, includes the embankment and valley in question.    In 1883 an act was passed by the legislature (chapter 452), by which the superintendent of public works was authorized and directed to construct or cause to be constructed a reservoir on the Black river above Forestport Pond, for the purpose of storing water for canal purposes, at an expense not to exceed $20,000.    That amount was appropriated for that purpose.    Thereupon, in the summer or fall of 1884, the site for the dam, being the present site, was fixed by the state engineer and the superintendent of public works.    Some work was done and mate-

rial obtained under the direction of the superintendent, but the appropriation, as the state engineer afterwards reported to the legislature, was only sufficient to prepare the site and provide part of the materials for building the dam. The work next done was in 1889. By chapter 274 of the laws of that year the superintendent of public works was authorized and directed to complete the construction of a reservoir on the Black river above Forestport Pond, and the sum of $45,000, or so much thereof as was necessary, was appropriated in addition to the appropriation of 1883 for the purpose of constructing a reservoir by building a dam not more than 20 feet in height. It was directed that the work should be let by contract, and should be completed on or before October 15, 1889. In September, 1889, a contract was entered into with one McGuire, who thereupon proceeded with the work of constructing the dam, built the abutment and wing walls, and an embankment on the side of the river. There was no structure that extended out into the bed of the stream. His work was stopped by the state officers about August, 1891. In April or May previous he was notified to stop work by reason of want of funds. The canal board, on the 27th December, 1889, approved of and adopted plans of the proposed dam at the height of 15 feet, and at the letting in 1889 a map and plan of the dam and reservoir were exhibited, the map being a reduction from the minutes of the survey of Phelps in 1881, and a copy of the original Phelps map. The map so exhibited was approved and adopted by the canal board on December 29, 1889. The work of the dam was not resumed until July, 1892, when, in pursuance of chapter 494 of the Laws of 1892 authorizing the superintendent to complete the construction of the reservoir and making an appropriation for that purpose, a contract was entered into with Beckwith and Quackenbush, and they completed the dam. By chapter 342 of the Laws of 1891, passed and taking effect May 6, 1891, it was provided as follows: "The superintendent of public works is hereby authorized to clear the flow ground that will be covered by water, upon the construction of a reservoir on the Black river above Forestport Pond." Provision was also made for letting the work by contract upon plans and specifications, and an appropriation was made to meet the expense. The work called for by this act was done by Beckwith and Quackenbush in summer or fall of 1892 under contract. A new map seems to have been made from the survey of 1881, which was examined and approved by the state engineer on 26th May, 1891, and adopted by resolution of the canal board June 10, 1891. A new survey was thereafter made to reestablish the flow line for the purpose of cutting timber off the flowed ground, and establishing the acreage. This survey was not completed until after 1892. It was found that many of the stakes set in 1881 had been destroyed or were gone. It appears that Kent knew of the survey in 1881, and its object, and he knew that a dam was being constructed. It also appears that the agents of the railroad company, when they laid out the route across the valley, were informed of the existence of the stakes, and that they indicated the flow line of a proposed dam. At the time of the contract and deed from Kent to the railroad company, his actual possession had not been interfered with

by the state, and he continued after the deed to the railroad to use the balance of the land the same as he always had, up to the time notice was served on him in September, 1892.

The foregoing statement presents the more important circumstances in this case, from which it is to be determined whether or not, on the 4th June, 1891, there had been accomplished, on the part of the state, an appropriation of the land in question.

In Waller v. State, 144 N. Y. 579, 39 N. E. 680, the rule was laid down that mere words of appropriation, unaccompanied by any act on the part of the officers of the state towards carrying such appropriation into execution and taking possession of or controlling in some form the property which is to be appropriated, cannot amount to an actual and complete appropriation. In Benedict v. State, 120 N. Y. 228, 24 N. E. 314, which related to the overflow of plaintiff's lands, caused by a permanent dam erected across Black river for canal purposes, it was held that the land was appropriated when the dam was completed, and the water in the river raised, and that the statute of limitations against the plaintiff's claim for damages commenced to run from that time. A similar rule is laid down in Mills, Em. Dom. § 310, citing Call v. Commissioners, 2 Bray, 232. At the time of the conveyance by Kent nothing had been done by the state to interfere with or control his possession and use. A flow line of a proposed dam had been run some 10 years before, and intermittent efforts towards building a dam had been going on. No notice of appropriation had then been served on Kent, and I fail to see how, within the rule of the Waller Case, Kent at that time had any claim for damages against the state for any taking of his land. The filing of a map alone did not accomplish that result. Ten Broeck v. Sherrill, 71 N. Y. 276, 279. The maps that are presumptive evidence of appropriation under section 6 of chapter 451 of the Laws of 1837 are maps of completed canals. Section 4, art. 1, c. 9, pt. 1, Rev. St.; 1 Rev. St. (8th Ed.) p. 692. By chapter 336 of the Laws of 1884, amended by chapter 118 of 1888, it was provided that in the construction or improvement of any canal or feeder whereby the superintendent of public works shall appropriate private lands or waters the superintendent shall serve upon the owners and occupants a written or printed notice of such appropriation containing an apt and sufficient description of the lands or waters appropriated. Provision was made for recording the notice with proof of service thereof on the owners or occupants in the clerk's office of the county where the lands were situated, and the owner had two years from the time of such service within which to file his claim for compensation. The notice which was served in this case by the superintendent in accordance with the act was dated on the 14th day of September, 1892, and stated that the superintendent "has appropriated certain lands," etc., referring to a map annexed thereto; and it further stated that the superintendent, "having made such appropriation, now enters upon said land and condemns the same for the purposes provided for in chapter 494 of the Laws of 1892, and assumes control and ownership of the same for and on behalf of the state of New York." This notice, it may be, did not conclude the state as to the date of the appropriation or entry. It was, however, the act of

the officer charged with the duty of making the appropriation, and was
his first act towards taking actual possession from the owners. Up
to that time he had not assumed to control the property or its posses-
sion at this locality.

It is argued that the act of 1891, providing for the clearing of the
flow ground covered by the reservoir, was in effect an appropriation
by legislative act, and was prior to the claim of the appellant, as it
was passed and took effect before the contract from Kent to the appel-
lant's predecessors. The act at most was an authority to the super-
intendent to appropriate, but was not in itself an appropriation. It
remained for the superintendent to ascertain—as he afterwards did
by additional surveys—the boundaries of the flow ground. Until that
was done, and the land taken possession of, the appropriation under
the act was not complete. An entry upon the site of the dam and com-
mencing to there construct the dam did not amount to a taking pos-
session of what might be the flow ground a mile above, and it was not
so designed or understood by the superintendent. We therefore con-
clude that at the time the predecessor of the appellant purchased its
property of Kent, and built its embankment, the property had not been
appropriated by the state.

But it is said that Kent and his grantees knew of the location of
the flow line of the proposed reservoir, and that work was being done
in the construction of the dam, and that, therefore, the railroad com-
pany took nothing by its purchase from Kent, or at least has no claim
for damages. In Forster v. Scott, 136 N. Y. 577, 32 N. E. 976, it was
held that the provision of the New York consolidation act, which de-
clared that no compensation should be allowed to the owner of land
taken for a street for any building erected or placed thereon after the
filing of a map of the proposed street as prescribed by the terms of
the act, was unconstitutional. It was an illegal restriction upon the
right of the owner to build upon his lot. A like view was taken in
Re Mayor, etc., of City of New York, 24 App. Div. 7, 49 N. Y. Supp.
119. In Mills, Em. Dom. § 316, it is said that owners have a right to
improve their own property, notwithstanding a line of public improve-
ments has been marked out, unless such improvements were made in
bad faith. The principle of the Forster Case seems to be applicable.
The reason would seem to be that, as long as the owner cannot compel
the other party to act or complete a pending proceeding, he should
not himself be restrained from the ordinary use and control of his
property. See Corporation, etc., v. Mapes, 6 Johns. Ch. 46, 50; In re
Wall St., 17 Barb. 617, 642.

It is further claimed that the appellant and its predecessors, in locat-
ing the roadbed and embankment and building the same across Black
river, violated the provision of section 17 of chapter 276 of the Laws
of 1834 in not obtaining the written consent of the superintendent
of public works to such crossing. This is on the theory that the
Black river is a canal feeder belonging to the state. If at that time
the land had been appropriated for a reservoir, as claimed by the de-
fendant, then very likely the reservoir, with the river at that locality,
would be deemed a canal feeder. If the land was not then appropri-
ated, and the question was whether the Black river, before the con-

struction of the reservoir, was at that locality a canal feeder, there may be some doubt whether the river in its original condition became a canal feeder simply because it was one of the sources of the water gathered and impounded in the pond below. Assuming, however, that it was, the question is whether the statute referred to is applicable. Chapter 276 of the Laws of 1834 is entitled "An act to incorporate the Medina and Darien Railroad Company." It contains the usual provisions of such an act, and then comes section 17, which is as follows:

"Sec. 17. The canal commissioners are hereby invested with a general and supervisory power over so much of any railroad as passes over any canal or feeder belonging to this state, or approaches within ten rods of such canal or feeder, so far as such power may be necessary to preserve the free and perfect use of the canals or feeders of this state, and necessary for making any repairs, improvements or alterations in the same; and said company shall not construct their railroad over or at any place within ten rods of any canal or feeder belonging to this state, unless said company shall lay before the commissioners aforesaid, a map, plan and profile, as well of the canal or feeder as of the route designated for their railroad, exhibiting distinctly and accurately the relation of each to the other, at all the places within the limits of ten rods, as aforesaid; and shall thereupon obtain the written permission of said canal commissioners, with such conditions, instructions and limitations as, in the judgment of said canal commissioners, the free and perfect use of any such canal or feeder may require."

In the general railroad act of 1850 (Laws 1850, c. 140, § 28, subd. 5), there was a provision that "every company formed under this act shall be subject to the powers vested in the canal commissioners by the seventeenth section of Chap. two hundred and seventy six of the Session Laws of eighteen hundred thirty four." In 1890, section 28 of the act of 1850 was repealed, but the general provision in the first clause of section 17 of the act of 1834 was, in substance, embodied in section 13 of the railroad law. Laws 1890, c. 565. In the canal law (Laws 1894, c. 338, § 25) the provision of section 17 of the act of 1834 was, in substance, embodied, with the modification that the provision requiring the written permission of the officer in charge of the canals was made applicable to all railroad corporations. Section 17 of 1834 is among the acts repealed by the canal law. So that, apparently, at the time the railroad of the appellant was built across the river, as well as at the time when the railroad company that built it was incorporated, the only law requiring written permission of the superintendent of public works was section 17 of the act of 1834. It will, however, be observed that the provision in that section requiring written permission as a condition precedent applies only to the corporation created by the act. The expression "and said company" could refer only to that corporation. There was a reason for making such a condition as to that corporation, as by the general route it was authorized to adopt it might pass near or over a canal or feeder then existing or contemplated in that vicinity. No question is made in the present case as to the general supervisory power of the superintendent. We are of the opinion that the failure of the constructing corporation to obtain the written permission of the superintendent before carrying its track across the Black river is not a bar to the appellant's claim. We therefore conclude that the appellant is in a position to recover its damages

properly chargeable to the state upon the basis of an appropriation subsequent to the construction of the railroad. The appellant suggests that the damages can be fixed by this court. We think that there should be a new trial.

Judgment reversed, and new trial granted, with costs of appeal to the appellant. All concur.