Murray, J.
This claim is filed to • recover damages for making a stone quarry, hereafter described, less accessible by reason of the State’s appropriating intervening land for the purposes of the improved, or new Barge canal.
In the year 1890, one Charles S. Benton was the owner of a piece or parcel of land running to the east from the Delaware and Hudson Company’s property at its railway station at Fort Ann, in the township of Fort Ann, Washington county and State of Hew York. On this land, east of Wood creek, which flowed between it and' the railway station mentioned, is a stone quarry known as the Bice stone quarry, comprising a tract of about fifteen acres and which is the subject of this litigation.
About the 14th day of March, 1906, the said Fenton leased to James E. Flood and James E. Sherrill, for the term of ten years, the. said Bice stone quarry and all the premises connected therewith, together with a right of way from the said quarry over and across the land mentioned to the railroad tracks of the Delaware and Hudson Bailway Company at Fort Ann, with the right to cross said land with a railroad track to enable the lessees to convey the products of the quarry to the said railroad tracks and bring from the railway tracks supplies for the operation of the quarry, and also the privilege of putting in machinery and erecting other necessary structures for the operation of the quarry.
It was agreed in the lease that the lessees should remain the owners of such structures and appliances as they put upon the land, and could remove them at the expiration of *436 the lease. This lease was recorded in the county clerk’s office of Washington county on August 7, 1906. Subsequently, and while this lease was in force, on March 24, 1906, Flood and Sherrill transferred and assigned it, with all the rights granted them and all their interest in the quarry, to the claimant herein. This assignment was also recorded in the county clerk’s office of Washington county at the same time the original lease was recorded. On August 27, 1906, the term of the original lease was extended for an additional term, making a total term of twenty years for which the property was leased.
The lease provided that Fenton, the owner and the lessor, was to receive the annual sum of $100 per year as rental and a royalty of four cents a cubic yard on all stone shipped from the quarry. When the original lease was transferred by Flood and Sherrill to the claimant’s company, they received for their leasehold rights and some plant, $30,000 in the stock of the company. They became, and are, officers of the Champlain Stone and Sand Company, and are largely interested therein.
Before the State formally appropriated the land hereinafter mentioned; there were upon the quarry property some machinery and bins constructed in 1907 for the mining, crushing and storing of the stone. There was also built a curved railroad track and roadbed from the quarry to the property of the Delaware and Hudson Company, connecting the quarry with the Delaware and Hudson Company’s railroad tracks at Fort Ann. The claimant niade the roadbed and the Delaware and Hudson Company put on the iron. The roadbed and all the appliances were, with the exception of the rails, bought and placed there by the stone company.
Between the quarry and the tracks of the Delaware and Hudson Company’s railroad at Fort Ann, and flowing through Fenton’s land, is Wood creek. The curved railway mentioned ran from the quarry to this creek, crossed Wood creek on a bridge and then ran to the railroad tracks. This spur, which was built in 1906 from the railroad, ran to Wood creek, spanned the banks of the creek by a wooden *437 bridge and then to the quarry. The Delaware and Hudson Company ran their cars, over and back, on this spur, over this bridge, to the quarry. The stone was dumped there in the cars, and the cars ran back to the railroad company’s tracks over the same route.
On December 27, 1906, there was filed in the office of the Superintendent of Public Works, at Albany, a map with the survey of land theretofore made which the State intended to formally appropriate for the purposes of the improved canal.
.The described land of Fenton was duly and formally appropriated by the State by the service on him on January 8, 1907, of the usual map and notice, and a duplicate thereof was served on the claimant on the 8th of August following. On January 14, 1907, a written notice to vacate the appropriated premises was served on Fenton.
The property of Fenton, thus condemned, lay between the railroad tracks of the Delaware and Hudson Company at Fort Ann and the claimant’s quarry. This land is traversed, or crossed, by Wood creek. The railroad track, or spur mentioned, was built by the claimants in the fall of 1907; it was used by the State for transporting its hydraulic dredge in the months of December, 1906, and January, 1907, and for a while previous to this it was not used by the claimants. In building the improved canal, the State follows, as closely as it is practicable, the course of Wood creek, which crosses, as mentioned, the land of Fenton taken by the State. After the appropriation of this property, the State used it for the purposes of the new Barge canal. The work authorized by the State destroyed the bridge built by the claimants across Wood creek, it cut off the direct transportation of stone from the quarry to the railroad company’s tracks, and rendered the quarry less accessible to the Delaware and Hudson Company’s railroad property.
Respecting the destruction of this bridge and the greater inaccessibility of the quarry, the claimant alleges that, in order to operate the said quarry to any extent, it was necessary to pass from said quarry directly across the land so appropriated to the railroad tracks of the Delaware and *438 Hudson Company; that said railroad track (which crossed Wood creek) was a necessary incident to the quarry plant, and without said railroad track the operation of the quarry would he practically impossible; that, by reason of the destruction thereof, the claimant has been deprived of a most valuable right of way and easement, and it has been deprived of the only convenient means of conveying fuel and other material to said plant, and of conveying and shipping •the products of the plant; that without the bridge the claimant will be unable to operate the plant, and the necessary cost of building such a bridge would involve the expenditure of a large amount of money.
The evidence of the claimant’s witnesses was that, without the railroad connection and the bridge across Wood creek, the lease was practically of no value.
The claimant’s officers lived in the vicinity of this quarry; they had known the property all their lives, and known about the quarry thirty years. When Flood and Sherrill obtained the lease from Fenton they testified: “ The quarry had
been practically unused for years. It was used occasionally, spasmodically. Might be used a month, and not again for two or three years, and used again for two or three months.”
“ The quarry was operated spasmodically, that is, if you had a job to do you might quarry a few stone there to complete that job, and then it was shut down.” “ Trap rock was never quarried in this quarry until we leased it, although it was known to be there.” The quarry in question had two kinds of stones, gniess and trap rock. Ho proper cross sections were run or, in my judgment, sufficient tests made to accurately approximate the quantity of either. The claimant’s witnesses estimated an immense number of yards of each; the State’s witnesses much less.
It was the claimant’s plan to mine and crush this rock, transport it by the railroad track or spur it built, over the bridge across Wood creek, to the Delaware and Hudson Company’s r-ailroad tracks, and find a market for it; principally on the good roads to be built by legislative authority. The value of this leasehold was thereupon estimated to be from $300,000 to $480,000.
*439 The Legislature passed an act (Laws 1903, chap. 147) known as the “ Barge Canal ” or “ The Improved- Canal Act.” This act, under the designation “ Champlain Canal route to be improved,” provided: “ Beginning in the Hudson River at Waterford, thence up the Hudson River canalized to near Fort Edward; thence via the present route of the Champlain Canal to Lake Champlain near Whitehall.” The 15th section of the act provided it was to be submitted to a vote of the people at the Hovember election, 1903. It is a matter of judicial cognizance that it was then submitted to and adopted by a vote of the people at that election.
. Hnder this statute, the State’s survey for the center line of the improved canal was run through Fenton’s property in September, 1904. It followed “ the present route of the Champlain canal.” In laying out this center line at this time, the State had a corps of five engineers; the work was done openly and it must have been done in the daytime. In running the center line, stakes were set to mark it and to mark the land to be appropriated. In low ground these stakes protruded some six inches over the surface, and when the land was hard they were driven nearly flush or even with the soil.
It was known that the survey for the center line had been made in September, 1904, and that it was marked by stakes which had been driven into the ground. .
The center line of the Barge canal, as surveyed in September, 1904, across Fenton’s property, has never been changed; the stakes were marked “ C.L.” (center line). This survey for the appropriation was made and the stakes which marked the appropriation lines were put in before Flood and Sherrill procured the lease from Fenton, which was March 14, 1906, before the construction of the claimant’s railroad spur and bridge across Wood creek. This switch, which was built in the fall of 1906, was then laid across the land which had been surveyed and marked to be taken by the State for the improved canal.
The claimant’s officers testified that they knew the State had surveyed Fenton’s, land and knew that the survey was between the quarry and the railroad. Sherrill, one of the *440 lessees from Fenton, says that he became interested again in this quarry in the fall of 1906 or early in January, 1907; that he heard they were talking about the Barge canal and that was all he knew about it; that, when he got the extension of the term of the lease, he did not know particularly about the Barge canal, when he got the extension of the lease he didn’t know where the canal was going — they said they were going to have a canal through there. The claimant began quarrying about June 1, 1907, and, from that time and until prevented by the State, marketed a small quantity of stone, a statement of which is attached to the evidence.
For convenience, the examination of this case will be divided into three parts and classified as: (1) The merits of the claim; (2) The rights of the claimant in Wood creek and to maintain a bridge over it; and (3) The damages sustained.
First. The merits of the claim, or the good faith of Flood and Sherrill in procuring the lease, under the circumstances, from Fenton, and the good faith of the claimant in presenting the claim in this action.
An analyzation of the evidence offered to the court substantially shows that this quarry was practically a disused one and was known by Flood and Sherrill to be such when they obtained the lease thereof from Fenton; that the Legislature passed chapter 147 of the Laws of 1903, generally known as the Barge Canal, or the Improved Canal Act, which was voted upon and adopted by the people at the ¡November election, 1903; that this act provided for the improvement of the Champlain canal and designated that it was to be rebuilt or improved “ via the present route of the Champlain Canal to Lake Champlain near Whitehall; ” that thereafter, and pursuant to the authority given by the people, the State commenced the reconstruction or rebuilding of the Champlain canal; that in the month of September, 1904, the State commenced the preliminary work of surveying for the improved canal, and this survey ran through Fenton’s property beside Wood creek and between the quarry and the Delaware and Hudson Company’s railroad tracks; that this *441 survey was open and notorious; it was made by a corps of five engineers and the line run was matter of general information and local knowledge and comment. The center line of the survey was indicated by stakes set in the ground which marked the center line, which were visible to all, and this center line, as marked, was not changed from the time of this survey, in September, 1904, to the time of the formal appropriation by the State of the land so marked out; that subsequently to this, in March, 1906, Flood and Sherrill obtained a lease of this quarry at an annual rental of $100 per year and a royalty of four cents a cubic yard on all stone shipped from the quarry to be paid to Fenton, the owner; and, in the fall of 190'6, there were built the railroad spur connecting the quarry with the railroad tracks of the Delaware and Hudson Company at Fort Ann and the bridge which crossed or spanned Wood creek. The railroad spur crossed the land which had already been surveyed and marked by the State to be appropriated. That the Barge canal was to be built; that the Champlain canal was to be improved via the present route of the Champlain .canal, were matters of common knowledge. Flood and Sherrill were citizens of this State, living in the neighborhood of the Champlain canal, in a locality where the canal controversy, at the time, awakened much interest and attracted the attention of the voters. It is presumed that every citizen does his duty, and that Flood and Sherrill did theirs in the right of franchise in the November election of 1903, at which the canal act was voted upon. Before Flood and Sherrill procured this lease and the railroad spur was built, it was matter of general information in that vicinity, and of local comment and talle, that the improved canal route was surveyed to run through Fenton’s land and between the quarry and the railroad company’s tracks. Wood creek being the lowland, it was matter of experience that a canal would naturally follow and take the stream so far as its sinuosities made it practical.
Flood and Sherrill were contractors dealing in stone, and it is reasonable to presume they kept themselves informed, and that they were conversant with this situation. In their evidence, while denying their knowledge of the definite route *442 of the new canal, they substantially say that they knew the local information that the canal had been surveyed to run through Fenton’s property between the quarry they subsequently leased and the Delaware and Hudson Company’s railroad tracks. The stakes set to mark the line of the land to be appropriated were visible to all. They could have seen them, and prudence, under these circumstances, should have prompted them to apply to the State officials for information whether the land marked for appropriation was to be formally taken, especially when they were to build this spur via a right of way over lands already surveyed and marked for condemnation, and which was subsequently claimed to be of such enormous value to the claimant. |
The court visited this property and saw and inspected the quarry. It is a hillside with rock exposed to sight and casual observation, with evidences of ephemeral quarrying,' and with shrubs and scrub trees in places, upon its sides and top. There was no hidden treasure or concealed wealth re-' quiring exploitation to discover it; technical experience told its character and required no scientific skill or experiments to develop a process of treatment to make it marketable. The stone needed only to be crushed to the requisite size to be ready for shipment. This was not a newly discovered quarry. It had been known and used in that locality for a long time, and Flood and Sherrill had known it for years. Their evidence is that “ the quarry had been practically unused for years. It was used occasionally, spasmodically, might be used a month, and not again for two or three years.” “ The quarry was used spasmodically, that is, if you had a job to do you might quarry a few stone there to complete that job, and then it was shut down.”
It seems logical that, if this quarry had been so long in existence and was so well known in that neighborhood “ that if you had a job you might quarry a few stone there ” and was as valuable as "now claimed, others would have leased it during all this period, or that quarrying would have been continuous.
Flood and Sherrill had known the quarry for years, and if it was worth so much that the claimant’s witnesses could *443 estimate the value of the leasehold from $300,000 to $480,-000, it is also logical to suppose Flood and Sherrill would have leased it long before — before there was any likelihood of its accessibility being interfered with — when they could have enjoyed all its advantages — and not have waited until the intervening property had been, under the law, surveyed , and marked for condemnation by the State and then sought a lease which would be in so short a time rendered valueless.
, And, truly, in fair dealing with the owner Fenton, they ' should have paid him more than $100 per year rental for a leasehold which for twenty years was estimated to be worth to the claimants the sum of $480,000.
Therefore, I doubt the good faith, the fair dealing, of the claimant, in presenting this claim; and I feel compelled to say, that it has impressed me as a scheme whereby, it being known that the Barge canal act was passed and under its authority the State was about to construct a work of great public improvement for the benefit of the people of the State and nation, and that the route for the improved Champlain canal had been surveyed and marked and was about to be built through Fenton’s land, the claimant procured the lease in question at a small annual rental, at which sum it didn’t risk much, and built the railroad spur and the bridge across Wood creek, with the expectation that the State would i appropriate such intervening land, and it thereby sought to reap a rich profit and to add to the burdens of the taxpayers of this State.
Practically, the market for the products of the quarry was to be the good roads authorized by the. Legislature. Or, in other words,' that through the State there would be a market for the stone of the quarry upon which the estimated value of the lease was greatly based; that the State would appropriate the intervening land of Fenton, which would make the quarry less accessible and be mulct in damages therefor; that the betterments which they put on the property, thus surveyed and marked for appropriation, would enhance the value of the lease and swell the cost of condemnation. The State was to be the creator, the destroyer, and the payer. The payee, the claimant in this action.
*444 In the discussion of the law applicable to this somewhat unique condition, it should first be remembered that this claimant comes into this court by the grace of the Legislature. It is a truism that a favor given is a favor not to be abused.
In Coster v. Mayor of Albany, 43 N. Y. 399, the court in its opinion, pages 409, 410, says: “The legislature has gone far, and often beyond the line of legal liability, and has made provision for the hearing and payment of claims which a court of law would not entertain. But it was in the exercise of a sovereign grace; it was the bestowal of a favor.”
Ho action will lie against the State, or any of its officers, ■without express legislative provisions. When the State abdicates its sovereignty, citizens who benefit by such act of grace acquire no vested rights, but simply a privilege granted by the State which may be hedged about and withdrawn. Matter of Hoople, 179 N. Y. 308; Sanders v. Saxton, 182 id. 477, 478, 479; Locke v. State, 140 id. 480.
The power of eminent domain is a natural and inherent right of sovereignty. It does not come from the Constitution. It existed before the Constitution. The power to appropriate property for public use, for the promotion of the general welfare, is a power inherent in every government. Harris Damages by Corp. §§ 16, 31, 32, 44. Lewis Em. Dom. § 9.
In taking property for public use, the State acts rightfully and not as a wrongdoer. It guarantees just compensation and nothing more. Lewis Em. Dom. § 9.
The State Constitution (Art. 1, § 6) provides: “Hot shall private property be taken for public use without just compensation.”
The Constitution is an inhibition of the inherent right of eminent domain in the sovereign, and merely prohibits the taking of private property for public use without just compensation. Harris Damages by Corp. §§ 31, 32. Friend Const. Bights and Public Policy, § 506.
The question whether Wood creek was “ private property ” and the rights of Fenton to it will be considered later.
But, assuming in this discussion of the merits of the claim *445 that the claimant owned private property which was the subject of appropriation, for which just compensation should be given, and that the sovereign power has exercised its right of eminent domain in relation to it, then the position of this claimant before this court is that under the law it is entitled to just compensation for the private property taken.
The definition of the word “ just ” is “ conformable to rectitude and justice; not doing wrong to any; violating no right or obligation; not transgressing the requirements of truth and propriety; rendering to each his due; ” and of the word “ compensation ” “ that which compensates for loss or privilege; a recompense for some loss.”
Lewis on Eminent Domain (§ 462) says: “ Just compensation ” means a full and fair equivalent for the loss sustained by the taking of the property for the public use. The fair market value of the land taken. Suth. Dam. § 1064. See also Canal Law.
Section 264 of the Code of Civil Procedure, in conferring jurisdiction upon this court, provided: “ The state hereby consents, in all such claims, to have its liability determined. * * * In no case shall any liability be implied against the state, and no award shall be made on any claim against the state except upon such legal evidence as would establish liability against an individual or corporation in a court of law or equity.”
Wo claim, other than for the appropriation of land, shall be maintained against the State unless the claimant shall file, etc. See also Canal Law, § 37.
It was the intention of the Legislature, in giving jurisdiction to this tribunal in this class of cases, that “ just compensation pursuant to the Constitution should be awarded to its citizens for property taken, “ conformable to rectitude and justice,” “ not doing wrong to any,” and “ violating no right or obligation; ” that the claim should not transgress the requirement of truth or propriety; that unconscionable claims should not be allowed against the sovereign power, and that its citizens could not buy, lease or procure property simply for the purpose of obtaining greater damages against the State; that the citizen should have a forum to which he *446 could come and receive just compensation for property equitably owned, in good faith obtained and justly held, which was taken by the State. The Legislature provided a direct-method by which the citizens could appeal to this court and the State’s liability was to be determined upon such legal evidence as would establish such liability against an individual or corporation in a court of law or equity.
Fraud in equity includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and which are injurious to another, or by which an undue and unconscientious advantage is taken of another. Gale v. Gale, 19 Barb. 249.
Fever, do I think, the Legislature intended by the statute that an undue and unconscientious advantage should be taken of the State, when a great public improvement was authorized for the benefit of all its citizens.
In Hayden v. Pierce, 144 N. Y. 512, it was held that a construction of a statute is to be avoided which is liable to produce mischief, or to promote injustice.
In Tyrrell v. Mayor, 159 N. Y. 239, the court held that the interest of the publ-ie, other things being equal, is superior to that of the individual.
There are a great number of cases involving the appropriation of land, tried annually in this court. To establish a precedent that claimants could recover, under similar conditions as disclosed by the evidence and the circumstances of this case, would promote such injustice and “ produce such a public mischief ” as would throw a grievously burdensome taxation upon the citizens of the State and retard the completion of the great public improvement now under construction.
Reise on Ultra Vires says: “Whenever from the plaintiff’s own stating or otherwise, the cause of action appears to arise from a transgression of a positive law of the country, he has no right to be assisted.”
“ The attempt to contravene the policy of a public statute is illegal, nor is it necessary to render it so that the statute should contain an express prohibition of such an attempt. It always contains an implied prohibition and to such at *447 tempts the principles of the common law are invariably and deadly hostile.” Reise Ultra Vires, § 69.
“An agreement contemplating the assertion of an unjust claim is void. Any contract which has for its object the practice of any deception upon the public or upon a public officer * * * or which is made in order to consummate a fraud on the public, or on the public treasury, or on third persons, is void.” Greenh. Pub. Pol. 153, 441.
By section 264 of the Code of Civil Procedure, the State consents to have its liability determined “ upon such legal evidence as would establish such liability against an individual or corporation in a court of law or equity.”
Therefore, the liability of the State in this case may be determined in this court upon such evidence as would establish its liability in a court of equity.
Randolph on Eminent Domain (§ 381) says: “ Equitable jurisdiction in respect to the essential obligations of eminent domain is well established.” Reise Ultra Vires, 468.
It has been held that, when the State invokes the aid of a court of equity, it is subject to the same rules as are applicable to ordinary suitors in that court (People v. Mould, 37 App. Div. 35; People ex rel. Forest Commission v. Campbell, 156 N. Y. 64) ; and the converse of the proposition must likewise be true.
A court of equity will not enforce an unconscionable or unequitable claim, nor permit its process to be used to produce an inequitable result. Broderick v. Smith, 26 Barb. 539; Bradley v. Dwight, 62 How. Pr. 300; Foster v. Hughes, 51 id. 20.
Where an unconscionable advantage has been taken equity will not relieve though not amounting to a fraud in law. Lyton v. Tallmadge, 14 Johns. 501.
Where the plaintiff has acted in bad faith, equity will not decree specific performance, nor if it would be inequitable, nor in the case of a hard and unconscionable bargain, Jones v. Babbitt, 66 Barb. 611; Fitzpatrick v. Dorland, 27 Hun 291; Mathews v. Terwilliger, 3 Barb. 50; Margraf v. Muir, 57 N. Y. 155.
*448 A court of equity may adopt its relief to the exigencies of the case. Baily v. Hornthall, 154 N. Y. 648.
If, therefore, one with the knowledge that the State is about to construct a public improvement for the benefit of the commonwealth, under an act in which the line and course of the improvement is specified and the survey therefor actually made and marked by stakes showing the boundaries of the land which the State is on the eve of appropriating — though before the notice of'such condemnation is formally served on the owner — with knowledge of such facts and circumstances, leases property which he knows will be rendered less accessible by the taking of the land for that public improvement, when appropriated, he is acting in bad faith to the State when he procures such a lease. Good faith to the sovereign requires he should seek definite information as to the likelihood of such land being taken, or wait a reasonable time to see, if, under such expressed intention of the State to take, the property is formally appropriated. With such knowledge and under such conditions and circumstances, in procuring such lease, he voluntarily put himself in a position of peril from which loss would probably ensue, and so acting with such knowledge and under such conditions, he was the author of any misfortune he might suffer, the consequences of which he seeks to cast upon the State. And if one so procure such a lease at an annual rental of $100 per year, and then seeks to mulct the State for the estimated value of the twenty-year term of the lease at from $300,000 to $480,000, it is such an unequitable, hard and unconscionable bargain as not to commend itself to a court of justice or equity.
It has been held: A party cannot be the author of his own misfortune, and then charge the consequences upon others.
One cannot voluntarily expose himself to danger and then recover damages arising from the peril he freely sought.
Damages for injuries which could easily have been avoided are not recoverable.
A tenant cannot recover from his landlord damages for injuries to his property which, with little trouble or expense, he could have prevented.
*449 One who makes improvements on land, in bad faith, cannot recover for the improvements made.
These cases might be multiplied indefinitely, but they are given to show that one of the basic principles of judicial decisions is to establish and promulgate the doctrine of good faith, fair dealing and equitable conduct between men.
So it has been stated: He who comes into equity must come with clean hands. Ho one shall take advantage of his own wrong. He that hath committed iniquity, shall not have equity.
“ Clean hands,” means a clean record with respect to the transaction with the defendant. Van Zile Eq., § 12.
The party aggrieved must come into court with clean hands. He must be innocent of any participation in the wrong. Unckles v. Colgate, 148 N. Y. 529.
Important distinctions are made against parties when the cause of action originates in a bad motive.' Suth. Dam., § 99. ;
In cases of injuries inflicted through the power of eminent > domain, it is expected that the owner will use reasonable and proper precautions to prevent or decrease the injury. Sedg. Dam., § 220. .
Mills in his work on Eminent Domain thus states the general rule: “ Owners have a right to improve their property,' notwithstanding a line of public improvements has been marked out, unless,, such improvements were made in bad, faith.” Mills Em. Dom., §§ 148, 316. ’
The above authority was cited by the court in N. Y. C., & H. R. R. R. Co. v. State, 37 App. Div. 57, at page 64 of the opinion.
In Matter of Mayor, 24 App. Div. 7, the court says: “ The land was not appropriated until the 27th day of February, 1895, when the commissioners finally decided to take it. * * *! The owner was not called upon by reason of the probability i of his land being taken to refrain from any act which the owner of the property might do by way of making his land' more valuable or better fitted for the purposes for which he had been in the habit of using it. Whatever he might do! upon the land by way of enhancing its value, which any *450 other owner might do, was lawful, and the public authorities could not restrain him in it * * *. Unless, perhaps, it
should appear that, with the certainty that the land was to be used, he was acting in bad faith, simply for the purpose of enhancing the damages which he was to receive for it. But nothing of that kind is presented in this case.”
In the case at bar the claimants were not the owners of the land. ' They were simply the lessees of the quarry, which was not appropriated, with the right of way, only, across the condemned premises. They procured the lease and built the spur on the right of way under the conditions before detailed.
The rule that no recovery is allowed where one makes improvements upon property in bad faith — with the expectation that it will be condemned —for the purpose of enhancing its value, has been recognized in some of our sister' States.
Second. The rights of the claimant in Wood creek and to erect over and maintain a bridge across it.
The claimant held a lease of the quarry in. question from Fenton, -for the term of twenty years. The quarry was not taken by the State. It was the adjacent property of Fenton which was appropriated, and over this property the claimant had a right of way from the quarry to the railroad tracks. It is the condemnation of this intervening land, which is traversed or crossed by Wood creek, that it is claimed has rendered the quarry so inaccessible that it is valueless, i The allegations of the claim and the evidence of the claimant’s witnesses respecting this division of the case, showing that the quarry, without a right to bridge Wood creek, or maintain a structure over it, was worthless, have been given supra. To maintain this connection with the railroad tracks over this right of way, it was necessary to build a bridge across Wood creek, or span it with some structure suitable for transportation. It is asserted by the claimant that Fenton had such rights in and to Wood creek that he could grant this privilege. It then becomes apparent that, if Fenton had no such rights, the theory of the claimant’s case I falls, and the burden is cast upon it of establishing such riahts.
*451 We will, therefore, discuss the rights of the claimant in Wood creek through Fenton and to maintain a structure over it.
The Constitution, supra, provides, “ private property ” shall not he taken without just compensation. Was Wood creek “ private property ? ” If it was public property, the State could exercise its inherent, natural, -sovereign right of eminent domain, without the prohibition of the Constitution.
In the case of Jane B. Johnson v. State, 62 Mise. Bep. 15, this court had occasion to examine and pass upon the controversy involving Wood creek. It was there found that, in the days of the aborigines of this country, Wood creek was part of a natural system of water communication connecting the Hudson river on the south with Lake Champlain on the north; that it was then a natural water highway between the Hudson river and Lake Champlain, and was used and traversed by the Indians when traveling between these points. When the Europeans came they used it for the same general purposes of public travel and transportation; its freedom for passage and traffic was continued, it was recognized, and the stream remained dedicated to the public by reason of its having been used by the public from time immemorial. The white man found an existing condition and continued it. It was not- claimed to be owned or controlled by any one, nor restricted by any authority for any purpose save that of use by the public. The pioneer, the hunter, the trapper, the civilian and the soldier, the man of peace and the man of war, each went upon and traversed its waters with the same liberty as they would follow their pursuits upon the broad ocean. It' was used by the explorer, the settler, the man of business, the courier, the scout and by contending forces in their invasions or retreat.
' This continued during the Colonial period to the time when the value of land made the owner wish to hold his property by muniments of title. On the 25th day of September, 1164, there was a crown patent granted, made by King George III, to sundry patentees, of certain land which included the Fenton property in question. These persons were the original predecessors in title of Fenton, and the grant *452 then made is known as the “Artillery Patent.” This patent granted 24,000 acres of land to the patentees named, and contained the following exception or reservation: “Excepting the said Wood creek which is reserved as a common highway for the benefit of the public
The Colonial authorities were evidently familiar with the situation of Wood creek; that it was then used, and had been used from time immemorial as a common water highway, and the public by reason of such uses had rights in and to it. So, by this grant and the exception therein, the sovereign formally recognized and ratified these rights and made a dedication to the public of Wood creek “ which is reserved as a common highway for the benefit of the public.”
By the fortunes of the Revolutionary War, the territory containing Wood creek passed to the State of blew York; and the State, as the successor of the Crown, received Wood creek “ reserved as a common highway for the benefit of the public ” charged with the public easement therein, and its dedication as a common highway for the benefit of the public. The legal status of Wood creek has not been changed from that time to the present day.
This ease, therefore, goes beyond those cases where the State has by public act declared a stream, theretofore not reserved to the public, to be a public highway; for here, Wood creek came to the State dedicated to, or reserved for, the public, for the reason that it was, by the first colonial grant, reserved as a “ common highway for the benefit of the public ” and thereby with navigability impressed upon it.
In People v. Gutchess, 48 Barb. 656, it was held: “Where a river, though not navigable, has been declared to be a public highway, the state has the right to control i'fcs use, and to prevent the erection of any bridges, or other works, which will obstruct its free passage as a public highway. The court in its opinion, page 666, says: “ Where the legislature has asserted for the state the right to control a particular river, and has expressly declared it to be a public highway by a public act, the state hais the tinques-( tionable right to control the use of the river, and to prevent *453 the erection of any bridges * * * which will obstruct the free use of the same as a public highway.”
I have examined the cases cited by the claimants’ attorneys in their brief, and in my judgment none of them overrule the principle enunciated in this case and some of the cases cited recognize it. To specify the cases would unnecessarily prolong this opinion.
Where the bed of a stream belongs to the State, no person has the right to use the same without its consent. Fort Plain Bridge Co. v. Smith, 30 N. Y. 44.
If my conception of the primal status of Wood creek be accurate, it is that it was a sort of a stream ferae naturae, open and free to the travel of all, and to the use of the public; or that, when it was reserved as a common highway, it was a kind of a corporeal hereditament, subject to the preexisting dominant easement in favor of the public, to be used as a common highway.
Fruend on Constitutional Eights and Public Policy, after remarking that the power over encroachments on water, such as bridges and piers, is governed by the same principles as that over street encroachments, in section 163, thus expresses the idea. The common use of a street is far more than a license. The use is of the essence of the purpose for which .the street exists, for which it has been dedicated, or for which the power of eminent domain has been exercised. It enters into the very nature of a public highway, and the use is so essential to the function of social and economic life, that the full enjoyment of individual liberty and property cannot be conceived without it. It must, therefore, be looked upon as one of the constitutional rights of the individual, in so far as the individual is part of the general mass of the people which is designated “ the public.” § 165. Such right may be acquired by reservation, purchase, dedication or condemnation — it may be either an easement or a fee. § 160. Fruend Const. Eights and Pub. Pol., §§ 160, 163, 165.
It was primarily used as a natural water highway, for traffic, transportation and the necessities or requirements of that period. It was at that time navigable for such boats or *454 crafts as were used upon it. It was a stream where the public had used it and exercised a free and unhampered right of passage over it from time immemorial.
By the first recorded grant of sovereign power in 1164, the crown recognized this condition and use by the public and it was “ reserved as a common highway for the benefit of the public; ” it was thereby dedicated to public use and consecrated to the people. The creek, by this original patent, was impressed with navigability; for, if it was a common highway, it could be traveled; and, being a water common highway, it must be navigable to be traveled; and being reserved to the public as a common water highway, it must be presumed to have been navigable for public purposes for the benefit of the public.
In this case, the State is now utilizing a stream so impressed with navigability, which was a natural water highway from the earliest known observation and used by the public as such; taking a creek which was “ reserved as a common highway for the benefit of the public ” by the original crown grant; using a stream which was never private property, for an internal improvement in the interest of the public, and improving it for the purpose of navigation, public travel and commerce, and making it part of a new system of the Barge canal of the State of Hew York.
Let us under such conditions and circumstances see what the law is applicable to this case.
Gould, citing Woolrych on Waters, 31, says: “Waters flowing inland, where the public has been used to exercise a free right of passage from the time whereof the memory of man is not to the contrary, or by virtue of legislative enactment, are public navigable rivers.” Gould Waters, § 53.
Any stream capable of being used in the transportation of any kind of property, whether in boats, rafts and single pieces, is a public stream and subject to public use. Harris Damages by Corp., § 188; Angelí Highways, §§ 55, 56.
Hature is competent to make a river navigable without the aid of the Legislature. Gould Waters, § 54.
Highways by water are as fully a public use as highways by land; and they may be used for the creation of a wholly *455 artificial system of navigation by canals. Bichólas Em. Dom., § 224. Freund Const.- Eight and Public Policy, § 163.
Canals authorized by public law are public highways. The towing path of a canal being a public highway, the same rule is applicable which governs in respect to acts done upon a public highway. The general doctrine is that any act of an individual done on a highway, though performed on his own soil, if it detracted from safety of travel, is a nuisance. Conkling v. Phoenix Mills, 62 Barb. 299; Robinson v. Chamberlain, 34 N. Y. 389.
Private streams which are navigable are public highways by water; and the rights of riparian proprietors are subject to the paramount right of the public to use and improve the stream as such highway and subject also to the right of the public to improve the stream for navigation. Lewis Em. Dom., § 69, Yl.
Bavigable rivers are public highways. They may be altered, deepened, and their channels changed; and damages resulting from such an improvement are not properly the subject of compensation, resembling in that respect the damages resulting from the improvement of highways. The public have the right to make use of the river as a natural highway; and, if the riparian owner is injured by such use, he is without remedy. Mills Em. Dom., § 80.
The public right of navigation is paramount upon a private navigable stream, and is as broad and extensive a right as it is upon public waters. It makes no difference in whom the title to the bed may be, it is always subject to the servitude of navigation by the public and to the right of the government to construct works therein in aid of navigation. § 166. Just as the private right of access to the highway is inferior to the public right to grade the street for the benefit of ordinary travel, the private right of access to public waters is inferior to the public right to construct works in aid of navigation, whether exercised by the United States • or the State. Bichólas Em. Dom., §§ 155, 166.
Bavigable streams, whether tidal or not, stand on the same footing as public highways and other property devoted *456 to public use. Thus a bridge cannot be thrown across a navigable stream without authority. Lewis Em. Dom., § 273.
Anything in a highway which impedes travel, endangers it, or obstructs the free use of the highway, is a nuisance. Harris Damages by Corp., § 187; Conkling v. Phoenix Mills, 62 Barb. 299.
Principles very similar to those governing streets apply to rivers. The right to pass on a river by boat is a common right.
When .one takes up his home on a highway, his very right to occupancy rests on the will of the sovereignty; his being there at all, except as he may use it in common with the public, and in pursuance of the purposes of its dedication, depends on the will of the government. Fruend Const. Bights and Pub. Pol., § 170.
It is not disputed that the owner of the fee cannot lawfully maintain permanent structures within the limits of a highway and above its surface, even if they are outside the traveled path and so do not interfere with public possession. Nicholas Em. Dom., § 70; Bandolph Em. Dom., § 65; Lewis Em. Dom., § 273.
I trust that the above authorities show that the State was lawfully exercising its paramount right in a navigable stream, and that, Wood creek being a common highway, the claimant had no right to build a bridge over it or maintain a structure across it. That the condition of Wood creek had changed; that it had practically ceased to be used by the public for navigation'with our modern vessels of magnitude, or that the public had practically ceased to use it as a common highway for the purpose of travel, makes no difference. Thé right still exists; and it is, through the improved canal, about to be restored to the public service, to the public use, and rendered capable for modern vessels to navigate it, and for the public to resume its use as a modern common highway. The reservation in the original patent yet remains, the easement created still exists, and its dedication still continues. The people have not relinquished their rights, and the sovereign has not extinguished control.
*457 If a road is shut up or disused, it cannot cease to be a public highway, and the public has a right to return to it at any time; and no one has a right to place an obstruction on it, or in any way hinder or impede the travel. Harris Damages by Corp., § 187.
Streets are held in trust for the public, and a city has no inherent right to surrender or impair the trust. Fruend on Const. Eights and Public Policy, § 161.
In the case at bar, the State is using Wood creek for the same general purpose for which it was originally used, and for which it was reserved in the Crown patent, that is, for public travel.
It has been held that the owner of the fee is not entitled to recover when a canal is laid out as "a public highway. By the same process of reasoning, the converse of the proposition should be true, that the owner of the fee should not be entitled to recover if a common water highway is laid out as a canal.
If a certain public easement is substituted for one of the same general nature to which the land is already subject, the owner of the fee is entitled to compensation only to the extent that the new easement is more burdensome than the old; hence, the owner of a fee is not entitled to recover if a turnpike is changed into a public highway, or a public highway to a turnpike, or where a canal is laid out as a public highway; and, as in Vermont, when a railroad was substituted for a plank road.
In these cases the new use is of the same general nature as the old; i. e. public travel. Nicholas Em. Dom. § 132; Lewis Em. Dom. § 271; Sedg. Dam. § 1152.
Canals authorized by public law are public highways. Green Highways, 115.
When the Crown made the grant known as the “Artillery Patent” in 1764, it excepted Wood creek from the operation of the conveyance, and did not part with the title to it, When the State succeeded to the rights of the Crown, after the Eevolutionary War, it became possessed of such property as constituted the sovereign domain within its boundaries; and the State has never parted, by public grant, *458 with such title to Wood creek so obtained. Wood creek then was, and now is, so far as State grants show it, public property. The State is now exercising an existing right on public property, in the construction of a general improvement for the public good.
The exercise of an existing right is not such a taking within the meaning of the Constitution as to entitle the owner to compensation. Bichólas Em. Dom. § 65; Mills Em. Dom. '§ 80.
One cannot have the remedy provided by law, unless he has suffered damages. Randolph Em. Dom. § 369.
Where projierty is subject to an easement or servitude in favor of the public, what would otherwise be an invasion or a taking has been held to be the exercise of a public right, so that no compensation is due. This is the case of improvements made on navigable waters in the interest of navigation. The easements of access and other water rights are subordinate to the public right of navigation and to everything incidental to it; and, therefore, a riparian■ owner is not entitled to compensation where his right of access is cut off by a public improvement for the benefit of navigation. Fruend, Const. Rights and Public Policy, §§ 408, 409, 509.
Third. Damages.
The claimant called witnesses as to the value of the leasehold and damages.
Burns, an officer of the company, estimated the value of the lease at $300,000. He didn’t think that the company could realize that for an assignment of the lease. He figured there were 600,000 yards of rock; and, deducting the estimated cost of getting it ready for shipment from the price it was to be sold for, it left a profit of fifty cents a yard, adding, “ That is the way, in my mind, I got at the value of the property.”
This assumes that nrunber of yards of rock was there; that the cost of production would remain the same; that it could continue to be sold at the same profit and that a market would exist for the consumption of the 600,000 yards.
Flood, another officer, valued the leasehold at $300,000. *459 Without the railroad connection it was practically of no value. He had no idea what it could he sold for.
Sherill, another officer, valued the lease prior to the appropriation of the intervening land at $400,000. After the appropriation it was not worth anything to him.
MacMartin estimated the value at $480,000 before the “ destroyal of the bridge,” and, since the appropriation, the value of the leasehold at $90,000.
“ There was nothing peculiar about the quarry — in other sections of the country there is plenty of trap rock.” He first knew of this trap rock when he sent a geologist to investigate the country, and he reported trap rock at Fort Ann. It was about four years ago.
He was an engineer of the Delaware and Hudson Company. He knew of the trap rock, yet made no effort to procure a lease from Fenton, from whom Flood and Sherrill secured a twenty-year term at the rental mentioned.
The State called witnesses as to value. The testimony of one needs only to be cited, that of the witness Shaper. He estimated the number of yards of trap rock at 100,000 and then gives his reasons for his conclusions that the quarry was of no value.
When land is injured or damaged, or waters taken, by the construction of a public improvement, the measure of damage is the difference between the market value of the land before and after the injury. Joyce Dam. §§ 2183, 2184, 2208; Sedg. Dam. § 1173.
For the reasons given in the preceding pages, I advise a dismissal of the claim or the awarding of nominal damages and' that judgment herein be given for the State.